Filed 9/30/16  Rafferty v. Suess CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| SUSAN RAFFERTY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>DR. FRED SUESS, M.D.<br><br>    Defendant and Respondent. | A142157<br><br>(Alameda County<br>Super. Ct. No. RG13668525) |

In March 2012, plaintiff Susan Rafferty (Rafferty) underwent two procedures to reduce signs of aging on her face.  The procedures were performed on the same day by defendant Fred Suess, M.D. (Suess) at the offices of defendant East Bay Plastic Surgery, doing business as Lifestyle Lift (Lifestyle Lift).  The next day, Rafferty noticed a mark on her right cheek.  When the mark developed into a scar, Rafferty sued Suess and Lifestyle Lift, alleging medical negligence.  The trial court granted defendants' motions for summary judgment.

On appeal, Rafferty argues that the trial court erred in granting summary judgment, claiming that the court erroneously struck her expert's declaration, and that even without the expert declaration there are still triable issues of fact.  We conclude that the trial court did not err, and we will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Rafferty Undergoes Elective Medical Procedures*

The following facts are undisputed.  In late January 2012, after seeing an advertisement for Lifestyle Lift procedures on television, Rafferty met with Suess for a

1

consultation about elective procedures to remove wrinkles from her face and neck.  Suess was to perform two procedures on Rafferty, a "Face and Neck Firming Procedure," or cervicofacial rhytidectomy (surgery), and a "Fractional CO2 Laser" Procedure on Rafferty's face and neck (laser procedure).

A staff member at Lifestyle Lift showed Rafferty with a mirror where incisions would be made as part of the surgery, and then stood behind Rafferty, with hands on either side of Rafferty's face, pulling back Rafferty's cheeks toward her ears to show her what would be done.  During the January consultation, Rafferty told Suess that she smoked six cigarettes a day.  Suess told her to quit smoking, and informed her that smoking affected blood circulation and increased the risk of poor healing or scarring after the procedures.  Rafferty said that she could not quit smoking.  Suess asked if she could cut her smoking in half, and Rafferty said she could.  Rafferty smoked about three cigarettes a day from the day of the consultation through the weeks after her surgery.  She smoked a cigarette on the morning of her procedures, and smoked again a few hours after them.

In February 2012, Rafferty signed two consent forms, one for the surgery and one for the laser procedure.  The surgery consent form explained that Rafferty would undergo "a surgical procedure for the tightening of skin and deeper structures of the face."  It explained that, "[a]lthough good wound healing after a surgical procedure is expected, abnormal scars may occur on the skin and deeper tissues," and that "[s]ome areas of the face may not heal normally or may take a long time to heal."  It stated, "There is the possibility of a poor result from Lifestyle Lift face- and neck-firming surgery.  This would include risks such as unacceptable visible deformities, loss of facial movement, wound disruption and loss of sensation.  You may be disappointed with the results from surgery.  You may need additional surgery.  Surgery is not an exact science.  Your physician will attempt to give you the best results possible.  However, you may not receive the result you expect because individual results vary.  Complications can develop that are unexpected and are not even contemplated."  The form included a paragraph captioned "Smokers":  "Smokers have a greater risk of complications because smoking

2

causes constriction of the blood vessels supplying the skin. Delayed wound healing, skin loss (necrosis) and infection are all complications that can occur at a higher rate in smokers. Also, if you are a heavy smoker who is unwilling or unable to quit, then your surgeon may decide to perform a more limited lifting procedure to decrease these risks, which are still higher than for a non-smoker. Since smokers have a higher rate of respiratory complications and delayed wound healing, smoking is not recommended for 1-3 weeks before and after surgery."

The consent form for the laser procedure stated that side effects could include "temporary redness . . . and mild sunburn-like effects . . . . Pigment changes (light or dark spots on the skin) lasting one to six months or longer may occur. . . . Other potential risks include crusting, itching, pain, burns, infection, scabbing, scarring and swelling. No guarantees or promises can be made concerning the results of the treatment." In signing the form, Rafferty affirmed that she understood that "not adhering to the post-care instructions provided to me, may increase my chance of complications."

At her deposition, Rafferty testified that she understood that Suess would make incisions around her ears and under her chin. She understood that the surgical procedure would affect her face, neck, and ears, and that her skin would be lifted. In particular, she understood that the skin on her face would be pulled back toward her ears. She understood that there was a risk of scarring to her face, that smoking caused a greater risk of complications, and that smoking was not recommended.

On March 1, 2012, Suess performed the surgery and laser procedure on Rafferty's face and neck. Suess's notes reported that Rafferty "tolerated the procedure well and left the operation room in satisfactory condition." Bandages were applied, and Rafferty was sent home with instructions to ice the surgical incisions each hour that she was awake for the next three days. Rafferty did not ice her incisions until the second or third day after the procedures, and then did so only four or five times a day.

On March 2, 2012, Rafferty returned to Suess's office, where the bandages were changed.[1] That evening, when she removed the bandages to clean the incisions, she noticed a mark on her right cheek—"a big brown mark" that "had like skin, just real loose skin or something." She testified that she "just thought it would go away," and she assumed that Lifestyle Lift knew about the mark, even though no one had mentioned it to her at her appointment earlier that day. Rafferty did not contact anyone at Lifestyle Lift about the mark, until her next visit to Suess's office on March 12, when her sutures were removed. During the period from March 2 to March 12, 2012, Rafferty could feel the tissue under the mark "getting really soft." At the March 12 visit, Suess told Rafferty to apply antibiotic ointment to the mark and bandage it.

Rafferty saw Suess twice more that month, on March 19 and 26, 2012. During the March 19 visit, Suess cleaned and bandaged the area of the mark, and told Rafferty to continue applying antibiotic ointment and a bandage.[2] Rafferty testified that she noticed improvement in the mark starting about two or three weeks after March 19; she said it "looked lumpy" on March 19, and later "looked better and better" and "wasn't real lumpy or anything." A note from the March 26 appointment reads, "P[atien]t was seen by Dr. Suess and p[atien]t is coming back on 4/2/12 to check healing on tissue n[e]crosis." Rafferty testified that the mark continued to improve, but developed some "hard skin or something." She testified that on two occasions Suess injected cortisone into the scar and instructed Rafferty to rub it, and that the mark flattened as a result.

Rafferty saw Suess twice in April 2012. At the first visit, Suess noted that Rafferty was "doing well" but "healing slowly." At the second, he noted that Rafferty's skin had healed and that Rafferty continued to smoke. He recommended she use

---

[1] A Patient Surgery Information Sheet from March 1, 2014, shows that a follow-up appointment was made for March 2, but none of the records describes the March 2 visit.

[2] Rafferty's medical records reflect that Suess "de[b]rided [the] cheek." Rafferty testified that Suess "took Q-tips or something, I'm not sure, and cleaned it out. And did a suction thing on it."

sunblock, an over-the-counter scar treatment product, and makeup to reduce the appearance of the scar.

Rafferty saw Suess twice more, once in May 2012, when Suess noted again that she was healing slowly, specifically with respect to a scar on her right cheek, and then in July 2012, when he inspected the scar and again recommended she use a scar treatment product and sunscreen.

By Rafferty's last visit with Suess, the mark looked red or pink, and at her deposition, in September 2013, Rafferty agreed that the mark was whiter than the rest of her skin. Except for the scar, Rafferty was satisfied with the results of the procedures.

B.    *Rafferty Files Suit*

In February 2013, Rafferty sued Suess, alleging negligence, and later amended the complaint to add Lifestyle Lift as a defendant. She alleged the defendants fell below the standard of care in her treatment, the treatment "proximately caus[ed] a hideous and permanent scar on [her] face where no procedure was contemplated and did not occur," and she would not have undergone the procedures if she had known "that she could be scarred on her face where no procedure was to occur or that such a hideous scar could be created."

C.    *Defendants Move for Summary Judgment*

In December 2013 and January 2014, Lifestyle Lift and Suess filed motions for summary judgment arguing that Rafferty could not prove negligence or causation, supported primarily by deposition testimony from Rafferty and a declaration from David White, M.D. (White), a non-treating expert.

White, a board-certified plastic surgeon, reviewed Rafferty's First Amended Complaint, the medical records provided by Lifestyle Lift's custodian of records, and the transcript of Rafferty's deposition, with exhibits. He summarized and analyzed the care provided to Rafferty by Suess and Lifestyle Lift and concluded they acted within the standard of care in treating her before, during and after the procedures; they acted within the standard of care in informing her of the risks of the procedures, including the

enhanced risks to smokers of poor healing, not healing, scarring and infection; and her scar was caused by her smoking before and after the procedures, not by defendants.

Defendants provided testimony from Rafferty's deposition that Rafferty understood that she would undergo treatment to her neck, face and around her ears and that the procedure would involve making incisions and pulling the skin on each side of her face back toward her ears. When Rafferty signed the consent forms, she understood that she was representing that she had read them and had the opportunity to ask questions about them.

D.     *Rafferty Opposes Summary Judgment*

Rafferty's primary argument in opposition was that defendants failed to meet their initial burden of presenting evidence to make a prima facie showing of the nonexistence of any triable issue of material fact.[3] As authority, she cited the jury instructions for res ipsa loquitur in the context of medical malpractice (CACI No. 518) and for informed consent (CACI No. 532). In addition, Rafferty submitted declarations with the goal of raising triable issues of fact with respect to the standard of care, res ipsa loquitur, and informed consent.

Rafferty submitted a declaration from her expert, James Chao, M.D. (Chao), which she characterizes as "supporting breach of duty with respect to the standard of care as to each defendant," specifically, "that Defendant's [sic] breeched [sic] the standard of care as to informed consent." Chao, a board-certified plastic surgeon, reviewed Rafferty's deposition "in part, photos before and after, operative report of Dr. Fred Suess and available Lifestyle Lift records." He does not identify which parts of Rafferty's deposition he reviewed, which photos he reviewed, or which records were available to him. The substantive portion of his declaration is reproduced here in full:

---

[3] Rafferty's responses to defendants' separate statements included a few terse objections to some of defendants' evidence. The objections did not cite any supporting authority, were not in the form required by California Rules of Court, rule 3.1354, and were not raised "at the hearing" as required by Code of Civil Procedure section 437c, subdivision (b)(5). The trial court declined to consider them. Rafferty does not contend on appeal that her objections have been preserved and we do not discuss them further.

"Based on my review of these documents, my education and my experience and personal knowledge of the standard of care of practicing plastic surgeons in California Defendant's [sic] fell beneath the standard of care in not having any post operative notes.[4]

"Defendant's [sic] fell beneath the standard of care in performing a face lift procedure in combination with a laser treatment on a known smoker which caused the 3 inch by 1/2 inch mark on Plaintiff's face.[5]

"Defendant also fell beneath the standard of care in not fully informing Plaintiff the [sic] additional complications that could occur on her face as happened to Susan Rafferty because of her continued smoking and going beyond the area of perioral fractional $CO_2$ treatment obtained [sic] in the informed consent process.

"It would have been within the standard of care to have Plaintiff sign a document on the day of her surgery that she was advised that her continued smoking could cause the mark on her face showing she made an informed decision.

"Defendant's [sic] may have caused the mark on Plaintiff's face by placing too much tension on the facelift skin when closing the wound during the procedure or wrapping the bandage too tight on her face after surgery which would have caused issues with respect to blood flow to her face. If there had been post op notes, these issues could have been examined in more detail."

In addition to the declaration from Chao, Rafferty submitted her own declaration in which she testified that if she had known that there was a risk of scarring from her "limited smoking," she would have cancelled the surgery. She also testified, "No one . . . explained to me . . . that any scarring could happen on my face where no procedure was to be performed. Where my scar is on the right side of my face there was no

---

[4] Contrary to this statement, the medical records include post-operative records, which White discusses in his declaration.

[5] This is inconsistent with Chao's subsequent opinions that in certain circumstances it would not be below the standard of care to perform these procedures on a known smoker, as well as his opinion that the scar may have been caused by tension on the skin or by the wrapping of the bandages.

7

procedure to be performed. There were to be no incisions. The incisions were basically behind my ears and under my chin. I accepted the risk that there could be complications regarding healing above ears and scarring where the incisions were to be made. But I did so because I knew no one would be able to see them."

E.    *Defendants Reply*

With their reply papers, defendants submitted detailed objections to the Chao and Rafferty declarations. Relying on various authorities, including *Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493 (*Bushling*), and *Jennings v. Palomar Pomerato Health Systems, Inc.* (2003) 114 Cal.App.4th 1108 (*Jennings*), they argued that Chao's declaration was inadmissible as expert testimony because it lacked foundation, and was conclusory and speculative. Defendants argued that Rafferty's declaration was inadmissible as irrelevant because it conflicted with her deposition testimony, and therefore could not raise a triable issue of fact under authorities including *D'Amico v. Board of Medical Examiners* (1974) 11 Cal.3d 1, and because Chao did not rely on it.

F.    *The Trial Court Grants Defendants' Motions*

The trial court issued a tentative ruling granting the motions for summary judgment. The tentative ruling was uncontested; no hearing was held and the tentative ruling became the order of the court. The court wrote, "The undisputed evidence submitted by Defendants establishes that to a reasonable degree of medical certainty Dr. Suess's medical care and treatment of Plaintiff complied with the applicable professional standard of care, that no act or omission of the Defendants' agents caused or contributed to Plaintiff's alleged injuries, and further that the consents signed by Plaintiff had adequate warnings regarding the increased risks of scarring to smokers. [Citations.] Dr. David N. White has opined that 'Plaintiff's continued smoking both before and after the surgery was, more likely than not, the cause of Plaintiff's post-surgical scarring' to her cheek. [Citation.] [¶] In opposition, Plaintiff has submitted an expert declaration that lacks foundation and offers no opinions as to causation within a medical degree of certainty. Dr. Chao speculates as to the cause of the scar '[b]ut, "an expert's opinion that something could be true if certain assumed facts are true, without any foundation for

8

concluding those assumed facts exist," has no evidentiary value.' (*Bushling*[, *supra*,] 117 Cal.App.4th [at p.] 510 (internal citations omitted)."

The trial court sustained defendants' objections to the entire declaration of Dr. Chao, and cited *Munro v. Regents of the University of California* (1989) 215 Cal.App.3d 977, 985 (*Munro*) for the proposition that when a motion for summary judgment is supported by expert declarations that defendant's conduct fell within the standard of care, defendant is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence. The trial court overruled defendants' objections to Rafferty's declaration, on the grounds that the objections were "not targeted such that only objectionable material is at issue." The court concluded that Rafferty failed to meet her burden to establish a triable issue of fact and defendants were entitled to judgment as a matter of law.

Judgments of dismissal were entered on April 30, 2014. This appeal timely followed. After the appeal was fully briefed, Rafferty asked to dismiss the appeal as to defendant Lifestyle Lift, and we granted her request.

## DISCUSSION

A. *Standard of Review*

A defendant is entitled to summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).[6]) "We review a grant of summary judgment de novo; we must decide independently whether the facts not subject to triable dispute warrant judgment for the moving party as a matter of law." (*Intel Corp. v. Hamidi* (2003) 30 Cal.4th 1342, 1348.) The evidence must be viewed in the light most favorable to the nonmoving party. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).) In deciding whether a material factual issue exists for trial, we "consider all the evidence set forth in the papers, except that to which objections have been made and sustained by the court, and all inferences reasonably

---

[6] All unspecified statutory references are to the Code of Civil Procedure.

9

deducible from the evidence." (§437c, subd. (c).) "Pursuant to the weight of authority, appellate courts review a trial court's rulings on evidentiary objections in summary judgment proceedings for abuse of discretion. [Citations.]" (Eisenberg, et al. Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group (2015) ¶8.168, p. 8-142.)

A defendant "moving for summary judgment bears the burden of persuasion that there is no triable issue of fact and that [the defendant] is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).) A defendant can meet this burden by showing that plaintiff "has not established and cannot reasonably expect to establish," an essential element of plaintiff's claim. (*Saelzler*, *supra*, 25 Cal.4th at p. 768.)

A defendant's initial burden in moving for summary judgment is to come forward with evidence to make a prima facie showing that there is no triable issue of material fact (*Aguilar*, *supra*, 25 Cal.4th at p. 850), where the material facts are determined by the pleadings. (*Fisherman's Wharf Bay Cruise Corp. v. Superior Court* (2003) 114 Cal.App.4th 309, 320.) If defendant meets that burden of production, the burden of production shifts to plaintiff to make a showing that there is a triable issue of material fact. (*Ibid.*)

B.    *Analysis*

       1.    *Negligence*

Here, there is no dispute that Rafferty has a scar on her cheek, and that it arose from a mark she first noticed the day after the procedures performed by Suess. To prove her negligence claim at trial, Rafferty must prove that Suess was negligent, and that his negligence caused her injury. (*Uriell v. Regents of the University of California* (2015) 234 Cal.App.4th 735, 744 (*Uriell*) ["medical negligence is fundamentally negligence"], citing *Flowers v. Torrance Memorial Hospital Medical Center* (1994) 8 Cal.4th 992, 999 (*Flowers*).) Rafferty must prove that Suess failed to use the level of skill, knowledge and care in diagnosing and treating Rafferty that other reasonably careful professionals would use in similar circumstances; as a specialist in plastic surgery, Suess is held to the standard of other specialists in plastic surgery. (*Neel v. Magana, Olney, Levy, Cathcart*

10

*& Gelfand* (1971) 6 Cal.3d 176, 188 ["[T]he special obligation of the professional is exemplified by his duty not merely to perform his work with ordinary care but to use the skill, prudence, and diligence commonly exercised by practitioners of his profession. If he further specializes within the profession, he must meet the standards of knowledge and skill of such specialists" (fns. omitted)].)

The applicable principles are set forth in *Flowers*: " ' "The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' The 'common knowledge' exception is principally limited to situations in which the plaintiff can invoke the doctrine of res ipsa loquitur, i.e., when a layperson 'is able to say that as a matter of common knowledge and observation that the consequences of professional treatment were not such as ordinarily would have followed if due care had been exercised.' [Citations.] The classic example, of course, is the X-ray revealing a scalpel left in the patient's body following surgery." (*Flowers*, *supra*, 8 Cal.4th at p. 1001, fn. omitted.) The conduct of a plastic surgeon in performing surgical or laser procedures is beyond a layperson's knowledge, and therefore expert testimony is required in order to determine whether Rafferty's treatment fell below the standard of care. (See *Munro*, *supra*, 215 Cal.App.3d at p. 985.)

2. *Defendant Met His Initial Burden*

By presenting expert testimony that defendants met the standard of care, and that Rafferty's scar was caused by her smoking, Suess supported his motion with evidence that Rafferty could not prove negligence or causation. (*Uriell*, *supra*, 234 Cal.App.3d at p. 743.)

In her opening brief on appeal, Rafferty contends for the first time that White's declaration is "[i]rrelevant or inadmissible," and that even though she did not object to it below, it cannot sustain a judgment. She offers a string of four case citations to support her statement, but fails to identify the pertinent pages of the cases she cites, or explain

why the cases support her position, and accordingly she has forfeited this argument. (*Allen v. City of Sacramento* (2015) 234 Cal.App.4th 41, 52 ["citing cases without any discussion of their application to the present case results in forfeiture"].)

In her reply brief on appeal, Rafferty contends that Suess did not shift the initial burden of production in his opening papers below, claiming that White's testimony as to the standard of care pertains only to Lifestyle Lift, and not to Suess. This argument has no merit. Although Rafferty asserts that White's declaration is "silent" as to the standard of care with respect to Suess, the declaration on its face plainly discusses both Suess and Lifestyle Lift.

We conclude Suess supported his summary judgment motion with evidence that Rafferty cannot prove negligence or causation, thus shifting the burden to Rafferty to present evidence showing the existence of triable issues of material fact as to negligence and causation.

3.      *Rafferty Failed to Raise a Triable Issue of Material Fact*

a.      *Rafferty Did Not Raise a Triable Issue as to Defendant's Undisputed Facts*

In the trial court, Rafferty purported to dispute just one of defendants' proffered material facts, that "Plaintiff testified that she understood that the procedure would involve her face, neck and ear regions." In support of this fact, both defendants cited the same evidence, including the following from Rafferty's deposition:

"Q  OK.  So you understood that the procedure would involve your face, your neck and your ear regions; is that right?

"A  Yes."

Rafferty responded to Suess's enumerated fact and evidence with, "Yes behind her ears and under her chin incisions were to be made, not on her face. The CO2 laser was around mouth not on her check where the scar is," followed by a general reference to Rafferty's multi-page declaration. Her response to Lifestyle Lift's identical fact and evidence was slightly different, though still supported only by a general reference to her declaration: "Disagreed, the procedure was to improve her face, the procedures were

12

incisions behind the ears and under chin. Laser around mouth. None on face where scar is." These responses, which concede that the area around Rafferty's mouth was to be treated, along with Rafferty's statement in her declaration and response to Lifestyle Lift that "the procedure was to improve [Rafferty's] face," do not create a dispute of any material fact.[7]

        b.     *The Trial Court Did Not Err in Excluding Chao's Testimony*

Because the trial court's exclusion of Chao's declaration leaves Rafferty with only her own declaration as evidence to oppose summary judgment, we begin by reviewing Rafferty's claim that the trial court's exclusion of Chao's testimony was error. Below, both defendants objected that Chao's declaration lacked foundation, and was conclusory and speculative because it was not based on evidentiary facts and lacked reasoned explanation. The trial court sustained the objections, ruling that Chao's declaration lacks foundation, "offers no opinions as to causation within a medical degree of certainty," and speculates as to the cause of the scar.

In this context, *Jennings, supra,* 114 Cal.App.4th 1108, which, as Rafferty concedes, "set forth the limits on expert testimony," is instructive. *Jennings* makes clear that "an expert's opinion based on assumptions of fact without evidentiary support [citation], or on speculative or conjectural factors [citation], has no evidentiary value [citation] and may be excluded from evidence. [Citations.] Similarly, when an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value because an 'expert opinion is worth no more than the reasons upon which it rests.' " (*Jennings*, *supra*, 114 Cal.App.4th at p. 1117.)

This describes the Chao declaration. Chao does not identify the factual basis for his conclusions, he provides no reasoned explanation of his opinions that defendants violated the standard of care, and he provides no reasoned explanation of his various

---

      [7] Rafferty's contentions and evidence as to the extent of the "procedures" to be performed by Suess are discussed in more detail in Section B.3.c of the Discussion, *post*.

13

conclusions and speculations about what caused or might have caused Rafferty's injury. For example, he does not provide any basis for his opinion that performing the surgery and laser procedure "on a known smoker" falls below the standard of care. He offers several different explanations for Rafferty's scar, none of which are tied to evidence: the scar was caused by defendants' performing the surgery and laser procedure on a smoker; the scar was caused by Rafferty's smoking and by laser treatment that went beyond the designated area; the scar could have been caused by Rafferty's continued smoking; and the scar could have been caused by the amount of tension placed on the skin in closing the wound, or by "wrapping the bandage too tight." In these circumstances, there is no abuse of discretion in the trial court's exclusion of Chao's declaration.[8]

Without Chao's declaration, Rafferty cannot offer expert testimony to raise any issues of fact as to the standard of care, dooming her theory that Suess fell below the standard of care in performing the surgery and laser procedures. (*Munro*, *supra*, 215 Cal.App.3d at p. 985 [" 'When a defendant moves for summary judgment and supports his motion with expert declarations that his conduct fell within the community standard of care, he is entitled to summary judgment unless the plaintiff comes forward with conflicting expert evidence' "].)

### c.     *Res Ipsa Loquitur Does Not Apply*

Rafferty contends that even without expert testimony, the doctrine of res ipsa loquitur applies to the facts of her case and that her declaration is sufficient to defeat summary judgment. We disagree.

"The judicial doctrine of res ipsa loquitur is a presumption affecting the burden of producing evidence." (Evid. Code, § 646, subd. (b).) For the presumption to arise,

---

[8] Even if Chao's declaration were admitted in evidence, its deficiencies make it insufficient to raise a triable issue of material fact. (*Nardizzi v. Harbor Chrysler Plymouth Sales, Inc.* (2006) 136 Cal.App.4th 1409, 1415 ["In adjudicating summary judgment motions, courts are 'not bound by expert opinion that is speculative or conjectural. . . .' [Citation.] 'The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact in favor of the party opposing the motion for summary judgment' "].)

Rafferty must show that her injury ordinarily would not have occurred unless someone was negligent, that she was under Suess's care when the injury occurred, and that her own voluntary actions did not cause or contribute to her injury. (*Brown v. Poway Unified School Dist.* (1993) 4 Cal.4th 820, 825-826 (*Brown*); *Blackwell v. Hurst* (1996) 46 Cal.App.4th 939, 943.) "[I]t is common knowledge that leaving scissors in a patient's abdomen after surgery is an occurrence that is ordinarily the result of someone's negligence. [Citation.] Similarly, it is commonly understood that negligence would ordinarily be suspected when a person sustains a shoulder injury during an appendectomy. [Citations.] [¶] 'Where the matter is regarded as within the common knowledge of laymen, as where the surgeon saws off the wrong leg, or there is an injury to a part of the body not within the operative field, it has been held that the jury may infer negligence without the aid of an expert.' (Prosser on Torts (4th ed. 1971) § 32, pp. 167-168.)" (*Curtis v. Santa Clara Valley Medical Center* (2003) 110 Cal.App.4th 796, 801 (*Curtis*).)

Rafferty can defeat Suess's motion by producing evidence of each of the three elements of res ipsa loquitur. (*Elcome v. Chin* (2003) 110 Cal.App.4th 310, 318.) Rafferty, however, has not produced evidence to create a triable issue of fact as to even the first of the three elements, that the harm would not have occurred absent negligence (*Brown*, *supra*, 4 Cal.4th 820; CACI No. 518), so we do not reach the second and third.

Rafferty's theory of res ipsa loquitur rests on her contention that a scar appeared "on [her] face where no procedure was to be performed." Her theory is defeated by her failure to come forward with evidence to support the contention. Rafferty implies that the "procedure" was limited to incisions at her ears and chin, and laser treatment around her mouth, but the evidence is to the contrary. Rafferty's declaration states that she understood that *incisions* would be made at her ears and chin. But the incisions were not the full extent of the surgical procedure to remove signs of aging on her face. This is reflected in one of the forms that Rafferty signed, which states that the face-firming procedure involves "tightening underlying structures and removing skin and fat from the face." And Rafferty testified at deposition that a staff member at Lifestyle Lift physically

15

pulled back Rafferty's cheeks toward her ears in front of a mirror, to show Rafferty what the upcoming surgical procedure would involve.[9]

Rafferty contends that it is common knowledge that a scar could not occur "where no surgery was performed," absent negligence, but this is not a case where a surgical instrument or other object was left in a patient's body after an operation or where a part of the body outside the operative field was injured. (*Curtis*, *supra*, 110 Cal.App.4th at p. 801.) To the contrary, any claim that the scar was not within the operative field is defeated by Rafferty's testimony that after the procedure, bandages were applied below her chin, up one side of her face, over the top of her head, and down the other side of her face, covering her cheeks and the site of the scar.

      d.     *Rafferty Has Not Raised a Triable Issue of Material Fact as to Informed Consent*

Below, Rafferty contended that testimony from her expert Chao raises an issue of fact as to whether Suess breached the standard of care as to informed consent. That argument is foreclosed by the exclusion of Chao's testimony, and we are left with the testimony of defense expert White that the forms, warnings and instructions provided to Rafferty by Suess and Lifestyle Lift were well within the standard of care. On appeal, Rafferty argues that even without expert testimony, she has raised a triable issue of material fact as to whether "the informed consent forms . . . adequately informed [Rafferty] that a scar could appear where no surgery or procedure was performed." We disagree.

In order to meet the standard of care, a physician must obtain a patient's informed consent before performing a medical procedure. (*Cobbs v. Grant* (1972) 8 Cal.3d 229, 243.) This means informing the patient of any risk that a reasonable person would consider important in deciding to have the procedure, and providing any other

---

[9] Even Dr. Chao, Rafferty's proffered expert, did not limit "procedure" to the making of incisions and the use of the laser around the mouth. Although Chao's opinions are inconsistent in several respects, they consistently associate the scar with the area of the surgery and laser procedures and thus contradict Rafferty's claim that the scar occurred where no procedure took place.

information skilled practitioners would disclose to the patient under the same or similar circumstances. (*Mathis v. Morrissey* (1992) 11 Cal.App.4th 332, 343; CACI Nos. 532, 533.) To prove failure to obtain informed consent at trial, Rafferty must prove, among other things, that Suess did not disclose important potential risks to her, and that she was harmed by a result or risk that should have been explained. (CACI No. 533.)

As she did in connection with res ipsa loquitur, Rafferty implies that the "procedure" was limited to incisions at her ears and chin, and laser treatment around her mouth. She argues that she knew there was a risk of scars where the procedures took place, but that the procedures did not include her cheek.

Rafferty's informed consent theory, like her attempt to invoke res ipsa loquitur, discussed above, is defeated by her failure to come forward with evidence to support her characterization of the scar as having appeared "where no surgery or procedure was performed." Rafferty contends that "there is no evidence, expert or otherwise, that plaintiff knew or consented to a skin lifting procedure on her cheek," and that Suess "had no permission to perform any procedure on her cheek where the scar is." These contentions do not suffice to raise a triable issue of material fact that an important potential risk was not disclosed, or that Rafferty was harmed by an undisclosed risk, in view of Rafferty's testimony that a Lifestyle Lift staff member pulled Rafferty's cheeks back toward her ears, to show Rafferty what the surgical procedure involved.

In sum, Suess is entitled to summary judgment on Rafferty's negligence claim. Rafferty has not come forward with expert testimony to raise a triable issue of material fact in the face of defense expert evidence that Suess did not breach the standard of care in any respect. She has not come forward with evidence to show that the burden-shifting doctrine of res ipsa loquitur applies, or that she was scarred where no procedure occurred.

## DISPOSITION

The trial court's judgment for defendant is affirmed. Respondent shall recover his costs on appeal.

17

_____
Miller, J.

We concur:


_____
Kline, P.J.


_____
Richman, J.